1
2
3
4
5
6
7
8                    **UNITED STATES DISTRICT COURT**

9                    **CENTRAL DISTRICT OF CALIFORNIA**

10

11  LISA HANSEN,                     )   NO. CV 10-05127 SS
                                     )
12                  Plaintiff,       )
                                     )
13            v.                     )
                                     )   **MEMORANDUM DECISION AND ORDER**
14  MICHAEL J. ASTRUE,               )
    Commissioner of the Social       )
15  Security Administration,         )
                                     )
16                  Defendant.       )
    _____)
17

18                             **I.**

19                         **INTRODUCTION**

20

21       Plaintiff Lisa Hansen ("Plaintiff") brings this action seeking to

22  overturn the decision of the Commissioner of the Social Security

23  Administration (hereinafter the "Commissioner" or the "Agency") denying

24  her application for Social Security Income benefits ("SSI").  The

25  parties consented to the jurisdiction of the undersigned United States

26  Magistrate Judge, pursuant to 28 U.S.C. § 636(c).  For the reasons

27  stated below, the decision of the Agency is AFFIRMED.

28

**II.**

**PROCEDURAL HISTORY**

Plaintiff filed an application for SSI on July 30, 2007, alleging a disability onset of January 30, 2007, due to bilateral knee pain and related limitations, diabetes, obesity, and hypertension. (Administrative Record ("AR") 28, 92-96, 110-118, 122-133, 139-147). The Agency denied Plaintiff's claim on October 12, 2007, as well as at the reconsideration level on January 8, 2008 Plaintiff requested a hearing before an Administrative Law Judge. (AR 44-55).

Plaintiff's hearing was held on July 21, 2009 before Administrative Law Judge Mary L. Everstine (the "ALJ"). (AR 24-42). On August 26, 2009, the ALJ issued an unfavorable decision. (AR 12-22, 343). Plaintiff appealed. (AR 343-45). The Appeals Council denied her request for review in a notice dated February 26, 2010.[1] (AR 4-11, 343). Plaintiff requested an extension for filing a civil action in federal court. (AR 3). On June 23, 2010, the Appeals Council granted a thirty-day extension. (AR 1-2). Plaintiff commenced the instant civil action on July 13, 2010.

//

---

[1] On February 26, 2010, the Appeals Council received the following additional evidence: (1) statement of Tom Hansen, Plaintiff's husband, dated September 15, 2009; (2) statement of Jill Redd, Plaintiff's close friend, dated September 17, 2009; (3) representative's brief dated September 24, 2009; and (4) records from the Santa Barbara Cottage Hospital, dated May 4, 2009 through August 31, 2009, as well as the records of Dr. Davies, dated October 7, 2009 through November 2009. (AR 7).

**III.**

**FACTUAL BACKGROUND**

Plaintiff was born on April 21, 1962, has a twelfth-grade education, and speaks English. (AR 28-29, 117, 119, 343). Prior to onset of the alleged impairments, Plaintiff worked as a forklift operator and industrial electrician. (AR 40-41, 102). Plaintiff asserts that she is disabled due to insulin dependent diabetes mellitus, moderate to morbid obesity and bilateral knee arthritis. (AR 111, 139-47, 343-45).

**A.  Plaintiff's Medical History**

Plaintiff fractured her right ankle on January 29, 2007 while walking her horse.[2] (AR 111, 172).[3] Plaintiff alleges that as a result of the fracture, her "[k]nees became further injured and inflamed from the jarring of walking in crutches." (AR 111). In May and June 2007, Plaintiff underwent a series of injections to her knees. (AR 184-86).

─────────────────────

[2]  Eugene Everett, M.D. ("Dr. Everett") reported: "[Plaintiff] slipped on some mud while walking her horse this morning and twisted her right ankle. It is swollen on the lateral aspect and tender. She has an old history, many years ago, of a sprain of her ankle." (AR 172). Dr. Everett further reported that "[x]-rays of the right ankle reveal a very minimally displaced fracture on the fibula at the lateral malleolus." (Id.).

[3]  On February 15, 2007, an x-ray showed that the fracture was in excellent position, and by the end of March 2007, treatment notes indicate that Plaintiff was "able to walk about the room on exam." (AR 188, 191).

3

In June 2007, Plaintiff was found to be overweight (Class III obesity) and bariatric surgery was scheduled. (AR 173, 181). In September 2007, diabetes Type 2 and hypertension were reported. (AR 173-74). On November 8, 2007, Plaintiff underwent gastric bypass surgery. (AR 37, 164). Even though Plaintiff lost ninety pounds following her successful gastric bypass surgery, she asserted that she still suffered from knee pain. (Id.).

**B. Examining Sources**

    **1. Martin Bean, P.A.**

On January 30, 2007, Plaintiff visited Martin Bean, P.A. ("Dr. Bean"), for treatment for her fractured right ankle. (AR 193). Dr. Bean's Progress Note states: "Right ankle lateral malleolus fracture with medical clear space changes." (Id.). Dr. Bean noted that Plaintiff's fracture had some swelling and tenderness and that Plaintiff experienced mild discomfort. (Id.). Dr. Bean placed Plaintiff in a short-leg cast and kept her "nonweight bearing." (Id.).

In an February 7, 2007 Progress Note, Dr. Bean reported that Plaintiff "presents today for follow-up x-rays of her right ankle lateral malleolus fracture with some medical clear space changes." (AR 192). In a February 15, 2007 Progress Note, Dr. Bean reported that x-rays of Plaintiff's fracture showed that it was in an excellent position and that "she has full neocirculatory function and good cast fit." (AR 191).

4

In a March 12, 2007 Progress Note, Dr. Bean reported that Plaintiff's right ankle was "nearly fully healed, but [did] still have some mild residual discomfort." (AR 190). In a March 13, 2007 Progress Note, Dr. Bean reported that Plaintiff's right ankle had "healed in excellent position." (AR 189). In a March 29, 2007 Progress Note, Dr. Bean reported that "[Plaintiff] has residual swelling and stiffness." (AR 188). In a April 26, 2007 Progress Note, Dr. Bean reported that Plaintiff had experienced significant improvement in terms of discomfort. (AR 187). Dr. Bean reported: "The fracture is stable and nontender. [Plaintiff] is able to bear weight and walk more comfortably." (Id.).

On May 24 and 31, 2007, Plaintiff visited Dr. Bean for bilateral knee Hyalgan injections. (AR 185-86). On May 24, 2007, Dr. Bean noted that Plaintiff's right ankle is "healing with decreased pain and increased range of motion." (AR 185). Dr. Bean reported: "The right ankle is improved dramatically and is no longer a significant issue." (Id.). Thereafter, on May 24, 2007, "a solution of Hyalgan was instilled in [Plaintiff's] bilateral knees without complication or difficulty with post injection teaching given." (Id.). On May 31, 2007, Dr. Bean reported that Plaintiff had responded well to the first injection and seemed to tolerate the second injection, administered on that day, as well. (AR 186).

On June 7, 2007, Plaintiff visited Dr. Bean for her third bilateral knee Hyalgan injection for her chondromalacia patella and osteoarthritis of the knees. (AR 184). In a June 7, 2007 Progress Note, Dr. Bean

reported: "a solution of Hyalgan was instilled in the bilateral knees without complication or difficulty." (Id.)

**2.    Christopher Ryan, M.D.**

On May 21, 2007, Plaintiff's treating physician, Christopher Ryan, M.D. ("Dr. Ryan"), from the Sansum Santa Barbara Medical Clinic, reported in a Progress Note that Plaintiff had severe arthritis of her knees. (AR 171). Even though she had steroid injections, Dr. Ryan noted: "[Plaintiff] is still having significant pain and limitations, unable to do her job as an electrician." (Id.). Dr. Ryan also stated that "[Plaintiff] is alert, in no acute distress. Remainder of exam is deferred." (Id.).

On May 14, 2008, Dr. Ryan conducted a "Form: Diabetes Mellitus Residual Functional Capacity Questionnaire." (AR 218-221). In that form, Dr. Ryan reported that he had seen Plaintiff since June 2003, and that her diagnoses was "IDDM, [without] morbid obesity, [and] severe arthritis [to both] knees." (AR 218). Dr. Ryan noted that Plaintiff would likely be absent from work for more than four days per month. (AR 221). In an accompanying Progress Note, Dr. Ryan reported that Plaintiff "occasionally has some sharp pain on the left [knee] consistent with her previous meniscal tear. She is considering a scope with Dr. Gainor." (AR 332). Dr. Ryan also reported that Plaintiff suffered from arthritis of multiple joints and morbid obesity in contrast to his finding that she was not morbidly obese. (AR 333).

6

On March 3, 2009, Dr. Ryan reported that the severity of Plaintiff's impairments met the requirements of Section 1.02 of the Listing of Impairments (the "Listing"), set forth at 20 C.F.R. Part 404, Subpart P, Appendix 1, due to severe bilateral knee chondromalacia. (AR 300-01). Dr. Ryan stated that Plaintiff has a major dysfunction of joints, as well as chronic pain. (AR 300). Further, Dr. Ryan noted that Plaintiff's knee problems preclude her from ambulating well. (Id.).

### 3. Daniel Berger, M.D.

On February 19, 2007, May 21, 2007, June 12, 2007, and July 31, 2007, Plaintiff visited Daniel Berger, M.D. ("Dr. Berger"), for treatment for her Type 2 diabetes mellitus. (AR 175-80, 181-83). On February 19, 2007, Dr. Berger reported that Plaintiff had "recently sustained a right ankle fracture approximately three weeks ago after falling." (AR 179). On May 21, 2007, Dr. Berger reported that Plaintiff was interested in gastric bypass surgery. (AR 177). On June 12, 2007, Dr. Berger and Plaintiff discussed the drug Avandia. (AR 182). On July 31, 2007, Dr. Berger reported that Plaintiff's condition had improved. (AR 175).

On January 6, 2009, March 10, 2009 and April 28, 2009, Plaintiff visited Dr. Berger. (AR 302, 312, 316). On January 6, 2009, Dr. Berger noted that Plaintiff had undergone the gastric bypass surgery, lost ninety pounds and was "overall doing well." (AR 316). However, Plaintiff's blood sugar control remained poor. (Id.). On January 15,

2009, Dr. Berger again observed that Plaintiff lost ninety pounds following the gastric bypass surgery, and that her weight was now stable. (AR 314). On March 10, 2009, Dr. Berger reported that despite the gastric bypass surgery, Plaintiff's diabetes was not resolved, and he recommended that she transition to insulin pump therapy. (AR 312).

**4. John W. Gainor, M.D.**

On June 19, 2007, before her gastric bypass surgery, Plaintiff visited John W. Gainor, M.D. ("Dr. Gainor"). (AR 181, 290). Dr. Gainor diagnosed Plaintiff with chrondromalacia knee, bilateral. (<u>Id.</u>).

**5. Keith Quint, M.D.**

On October 3, 2007, State agency medical consultant, Keith Quint, M.D. ("Dr. Quint") examined Plaintiff. (AR 194-198). Dr. Quint reported that Plaintiff was limited to lifting and carrying ten pounds frequently and twenty pounds occasionally. (AR 195). Dr. Quint also reported that Plaintiff would be limited to occasionally kneeling, crouching, crawling, and climbing ramps/stairs, and was precluded from climbing ladders/ropes/scaffolding. (AR 196). Dr. Quint found that Plaintiff should avoid concentrated exposure to heights and uneven terrain. (AR 197).

//
//
//
//

**6.  Chantal Gariepy, R.D., C.D.E.**

On June 15, 2007, Chantal Gariepy, R.D., C.D.E. ("Gariepy") evaluated Plaintiff for gastric bypass weight loss surgery.  (AR 257). Gariepy noted that Plaintiff "rides her horse [three to six] times per week."  (AR 258).

**7.  Gerri French, M.S., R.D., C.D.E.**

On October 7, 2008, Gerri French, M.S., R.D., C.D.E. (" French") evaluated Plaintiff.  (AR 278).  French reported that Plaintiff's activities were "[l]imited because she needs knee replacements.  She does ride horses a bit and tries to do the best she can, but she does have some limitations.  Surgery is pending."  (<u>Id.</u>).

**C.  <u>Consultative Evaluation</u>**

**1.  Juliane Tran, M.D.**

On December 16, 2007, consultative examiner Juliane Tran, M.D. ("Dr. Tran") conducted a comprehensive orthopedic evaluation of Plaintiff.  (AR 205).  Dr. Tran found:

> [Plaintiff] is mildly to moderate[ly] obese.  She ambulates
> to the exam room with slow gait.  She used a cane.  She seems
> to be comfortable with sitting.  She is able to get on and
> off the exam table but slowly.  General mobility is slow and

guarded.  It is uncertain if she has painful behavior during
the knee exam.

(AR 206).  Dr. Tran found that Plaintiff probably has "degenerative
joint disease," but that there was "[n]o evidence of knee instability."
(AR 208).  Dr. Tran further reported:

> [Plaintiff] has restriction of knee range of motion.  It is
> unclear whether she has low pain threshold or not.  It is
> unclear if she has maximum effort during the examination.
> She does have restriction with knee range of motion.  Her
> gait is mildly antalgic.  She has knee joint pain.

(Id.).

Based on this examination, Dr. Tran concluded that Plaintiff "would
be restricted with standing, walking no more than six hours a day or
activities involving frequent bending, stooping, kneeling or crouching."
(AR 208).  Dr. Tran also explained that Plaintiff "may be restricted
with frequent negotiating steps, stairs or uneven terrain or activities
involving frequent climbing or balancing activities but not occasional."
(Id.).  Finally, Dr. Tran reported that Plaintiff "would be restricted
with lifting no more than [twenty-five] pounds occasionally or [ten]
pounds frequently."  (Id.).
//
//
//

10

**D.  Vocational Expert's Testimony**

Elizabeth Cerezo-Donnelly, an impartial vocational expert ("VE"), testified on July 21, 2009.  (AR 15, 40-42).  The ALJ provided the following hypothetical question to the VE:

> Assume a hypothetical individual who's a younger individual with a high school education, the same past work experience, who retains the residual functional capacity for sedentary exertional work as defined in the Dictionary of Occupational Titles and Social Security regulations, but should avoid any working at heights or unprotected, unprotected heights, excuse me, or operation of hazardous machinery and when walking or standing requires a cane for balance.  That precludes the past work.

(AR 41).  The ALJ then posed the following question to the VE: "Are there jobs that could accommodate those limitations that are sedentary with no heights, hazardous machinery and a cane when standing or walking?"  (AR 41).  The VE responded:

> Yes.  For example, a final assembler in the optical goods industry.  It's an unskilled, sedentary job.  The DOT code is 713.687-018.  In California there are approximately 30,000 positions and in the United States there are approximately 328,000.  Another example is a telephone order clerk, with the beverage industry, such as at a hotel or restaurant.

It's unskilled and sedentary.  The DOT code is 209.567-014.
In California there are 19,450 jobs, in the U.S., there are
approximately 232,000.

(AR 41).  The VE confirmed that the jobs would not accommodate
absenteeism more than one day per month.  (AR 41-42).  The VE also
concluded that these job would be ruled out "[i]f a person was unable
to sit for prolonged periods of time without raising their legs to waist
level."  (AR 42).

**E.    Lay Witness Testimony**

    **1.    Tom Hansen**

On September 15, 2009, Tom Hansen ("Hansen"), Plaintiff's husband,
submitted a letter.  (AR 341).  Hansen explained that "[t]he purpose of
[his] letter is to dispute some of the conclusions found in the decision
made by the [ALJ]."  (Id.).  Hansen stated: "It seems that there is an
issue on whether or not my wife still rides horses and her credibility
surrounding that issue."  (Id.).  Hansen explained that Plaintiff "was
able to enjoy her hobbies riding horses on a regular basis, with some
discomfort, until around January 2006."  (Id.).  Hansen claimed that
starting in January 2006, Plaintiff's riding "started to tail off
because of severe pain in her knees."  (Id.).  Hansen further alleged
that "[i]n January 2007, [Plaintiff] stopped riding all together as her
knees got to the point that she was having problems functioning in her
normal daily activities let alone horseback riding."  (Id.).

12

**2.   Jill Redd**

On September 17, 2009, Plaintiff's close friend, Jill Redd ("Redd"), whom Plaintiff had known for about fifteen years, submitted a third-party function report.  (AR 342).  Redd stated that she and Plaintiff "used to work together prior to [Plaintiff] getting a disability retirement from work because of her knees." (Id.).  Redd further asserted that she owns horses and boards her horses at the same facility that Plaintiff boards her horses.  (Id.).  To that end, Redd explained that : "[i]n early January 2007 [she] started taking care of [Plaintiff's] horses on a regular basis as [Plaintiff] could no longer do it herself." (Id.).  Finally, Redd asserted that to the best of her knowledge, Plaintiff has not ridden horses since late 2006, and that along with Hansen, Redd has taken responsibility for Plaintiff's horses for the last two-and-a-half years.  (Id.).

**F.   Plaintiff's Testimony**

Plaintiff appeared in person at the 2009 hearing.  (AR 26-40). Plaintiff testified that she has severe degenerative joint disease in her knees.  (AR 29-30).  Plaintiff testified that she takes Tylonal for pain.  (AR 31).  Plaintiff further testified: "I was taking four pills every [four] hours, that was [sixteen] a day just to function at work, just so I could go to work." (AR 36).  Plaintiff testified that when her doctor found out about this, he said that she should not take that much "and when I did that, that's when I realized just how bad my knees were hurting, just how bad they were.  And that's when Dr. Daner

13

recommended significant weight loss to try to keep me working." (AR 36-37).

Plaintiff testified that she underwent the gastric bypass surgery in November 2007 to improve her knees and diabetes. (AR 37). Plaintiff testified that the gastric bypass surgery was a success, but only insofar as she "lost originally ninety pounds." (AR 29-30, 37). Plaintiff testified that following the surgery, her diabetes remained problematic. (AR 37-38). Plaintiff testified that she must monitor her blood sugar nearly every two hours to make sure that she does not experience a low blood sugar episode. (AR 37, 39). Indeed, Plaintiff testified that her glucose "spirals up in the evenings mostly." (AR 31). Plaintiff testified "I crash at least once a day, sometimes twice a day and at night, at least every other night." (Id.). To that end, Plaintiff testified:

> I start to become out of it. I can't concentrate. If they're talking to me, I stop talking. I have extreme trouble concentrating on what's going on around me. I can't even concentrate on what someone's saying to me and it will usually be the other people around me that say hey Lisa, what's your blood sugar? I think you're getting low. They will figure it out before I do because I, I'm, I'm just not connecting the dots anywhere.

(AR 40). Plaintiff testified that she is on a pump, which has "helped a little bit with the high spikes, but I'm still getting quite a bit low

14

blood sugar, so we're, we're trying to get rid of the low blood sugars as a[n] issue first." (AR 32). Plaintiff also testified: "My knees still continue to give out. [The gastric bypass surgery] did not improve my knee situation at all . . . there's still been considerable damage, even over the last two years, in my knees." (AR 30).

When asked why she has not gone forward with knee replacement surgery, Plaintiff testified that she had "been trying to get [her] doctor to and up until [her] last appointment with him, he was refusing to do that because of [Plaintiff's] age and saying [she] was too young and he wanted until [Plaintiff] was in [her fifties]." (AR 35). Plaintiff testified:

> [At] my last appointment with him, three or four weeks go, [my doctor] finally agreed to do knee replacements, [he] said we've tried everything that there is to try. You have no quality of life. [He] agreed we need to get you back to work because that is really my goal, and have a quality of life, so he's finally agreed to do knee replacements.

(Id.).

Plaintiff testified that she has difficulty standing and sitting for long periods of time. (AR 32). Plaintiff testified:

> I cannot sit in a knee bent situation for more than [twenty to thirty] minutes . . . without having severe knee pain and

```
 1          . . . if I've had a low glucose episode, even sitting up and
 2          my eyes open after that for an hour or two is very difficult.
 3          Usually I have to take a nap and lay down and close my eyes.
 4
 5   (Id.).  Plaintiff testified that she uses a cane to walk and stand.
 6   (Id.).  Plaintiff testified that she "can lift maybe [five to ten]
 7   pounds and very briefly and that's really about it.  I just have so much
 8   extreme sharp pains in my knees."  (AR 33).  Plaintiff testified that
 9   the pain associated with sitting is relieved if she extends knees
10   straight out.  (Id.).  However, Plaintiff testified that this relief is
11   only partial: "I always have a numbing, a numb pain, but it will take
12   the extreme, usually will take the extreme pain away, even if I'm
13   sitting on the couch with my legs out flat."  (Id.).
14
15       Plaintiff testified that she cannot do many household chores and
16   that her husband does most of them: "My husband takes care of dinner and
17   cleaning the kitchen."  (AR 33, 146).  Plaintiff also testified that she
18   cannot take care of her own personal needs, or shower or shampoo her
19   hair.  (AR 33-34, 146).
20
21       Plaintiff testified that after her glucose falls, she experiences
22   extreme fatigue for the rest of the day, "typically, but the most
23   extreme part is two hours, usually two hours after it takes me somewhat
24   to recover."  (AR 32).
25
26       Plaintiff also testified about her horseback riding.  (AR 34).
27   Plaintiff testified:
28
```

16

I haven't . . . ridden horses in . . . a . . . good year-and-a-half or so.  I still own them.  I'm hoping some day to be able to get back on them, but . . . I have a friend that rides them right now for me . . . but . . . I'm not sure if I'll be able . . . to keep them.

(Id.).  Regarding the report that indicated that Plaintiff rode horses as of October 2008, Plaintiff testified: "He might have misunderstood. I do go out there occasionally when my, my good friend comes to pick me up and we go out there, but I might turn them out in the arena or something, but as far as riding, I think he might have misunderstood that."  (Id.).

## IV.

### THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS

To qualify for disability benefits, a claimant must demonstrate a medically determinable physical or mental impairment that prevents her from engaging in substantial gainful activity[4] and that is expected to result in death or to last for a continuous period of at least twelve months.  See Reddick v. Chater, 157 F.3d 715, 721 (9th Cir. 1998) (citing 42 U.S.C. § 423(d)(1)(A)).  The impairment must render the claimant incapable of performing the work she previously performed and incapable of performing any other substantial gainful employment that

---

[4] Substantial gainful activity means work that involves doing significant and productive physical or mental duties and is done for pay or profit.  See 20 C.F.R. § 416.910.

17

exists in the national economy.  <u>Tackett v. Apfel</u>, 180 F.3d 1094, 1098

(9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

To determine if a claimant is entitled to benefits, an ALJ conducts a five-step inquiry.  <u>See</u> 20 C.F.R. § 416.920 ("This section explains the five-step sequential evaluation process we use to decide whether you are disabled, as defined in § 416.905.").  The steps are:

(1)  Is the claimant presently engaged in substantial gainful activity?  If so, the claimant is found not disabled. If not, proceed to step two.

(2)  Is the claimant's impairment severe?  If not, the claimant is found not disabled.  If so, proceed to step three.

(3)  Does the claimant's impairment meet or equal the requirements of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1?  If so, the claimant is found disabled.  If not, proceed to step four.

(4)  Is the claimant capable of performing h[er] past work? If so, the claimant is found not disabled.  If not, proceed to step five.

(5)  Is the claimant able to do any other work?  If not, the claimant is found disabled.  If so, the claimant is found not disabled.

<u>Tackett</u>, 180 F.3d at 1098-99; <u>see</u> <u>Bustamante v. Massanari</u>, 262 F.3d 949, 953-54 (9th Cir. 2001); <u>see</u> 20 C.F.R. § 416.920(b)-(g)(1).

18

The claimant has the burden of proof at steps one through four and the Commissioner has the burden of proof at step five. See Bustamante, 262 F.3d at 953-54; see Andrews v. Shalala, 53 F.3d 1035, 1040 (9th Cir. 1995) (holding that "[t]he claimant bears the burden of proving entitlement to disability benefits."); see Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995) ("In determining the ultimate issue of disability, claimant bears the burden of proving she is disabled."). If, at step four, the claimant meets her burden of establishing an inability to perform the past work, the Commissioner must show that the claimant can perform some other work that exists in "significant numbers" in the national economy, taking into account the claimant's RFC, age, education and work experience. See Tackett, 180 F.3d at 1100; 20 C.F.R. § 416.920(g)(1). The Commissioner may do so by the testimony of a vocational expert or by reference to the Medical-Vocational Guidelines appearing in 20 C.F.R. Part 404, Subpart P, Appendix 2 (commonly known as "the Grids"). Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2001). When a claimant has both exertional (strength-related) and nonexertional limitations, the Grids are inapplicable and the ALJ must take the testimony of a vocational expert. Moore v. Apfel, 216 F.3d 864, 869 (9th Cir. 2000).

**V.**

**THE ALJ'S DECISION**

Here, the ALJ employed the five-step sequential evaluation process and concluded that Plaintiff was not disabled under the Social Security Act. (AR 17-22). At step one, the ALJ found that Plaintiff "has not

19

engaged in substantial gainful activity since January 30, 2007, the alleged onset date." (AR 17). At step two, the ALJ found that Plaintiff alleged the following severe impairments: "degenerative joint disease of the knees, status post arthroscopic repair; history of morbid obesity status post gastric bypass . . . and insulin dependent diabetes mellitus." (Id.).

At step three, the ALJ found that Plaintiff's severe impairments at step two did not meet or medically equal a listed impairment. (AR 17). At step four, the ALJ found that Plaintiff had the following residual functional capacity:

> [Plaintiff] has the residual functional capacity to perform
> sedentary work as defined in 20 CFR 404.1567(a) except for
> the need to use a cane when walking/standing; occasional
> walking on uneven terrain; and preclusion from working in
> unprotected heights or operation of hazardous machinery.

(Id.).

Lastly, at step five, the ALJ found that "[c]onsidering [Plaintiff's] age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [Plaintiff] can perform." (AR 21). Specifically, in relying upon the testimony of the VE, the ALJ concluded that "[Plaintiff] would be able to perform the requirements of representative occupations such as final assembler . . . and telephone order clerk."

(AR 21).  Therefore, the ALJ concluded that Plaintiff was not disabled because Plaintiff could perform other work with jobs existing in significant numbers in the national economy.  (AR 20-21).

## VI.

### STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's denial of benefits.  "The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive." See Andrews, 53 F.3d at 1039.  Therefore, "[t]he Secretary's decision to deny benefits will be disturbed only if it is not supported by substantial evidence or is based on legal error."  Id.; see Aukland v. Massanari, 257 F.3d 1033, 1035 (9th Cir. 2001) (holding that "[t]his court may set aside the Commissioner's denial of benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole."); see also, Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996).

"Substantial evidence is more than a scintilla, but less than a preponderance."  Reddick, 157 F.3d at 720.  It is "relevant evidence which a reasonable person might accept as adequate to support a conclusion." (Id.).  To determine whether substantial evidence supports a finding, the court must "'consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's] conclusion.'" Aukland, 257 F.3d at 1035 (quoting Penny v. Sullivan, 2 F.3d 953, 956 (9th Cir. 1993)); see also, Andrews, 53

21

F.3d at 1039. "If the evidence can reasonably support either affirming or reversing the Secretary's conclusion, the court may not substitute its judgment for that of the Secretary." See Reddick, 157 F.3d at 720-21. Indeed:

> To determine whether substantial evidence supports the ALJ's decision, [the Court of Appeals] review[s] the administrative record as a whole, weighing both the evidence that supports and that which detracts from the ALJ's conclusion. The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities. [The Court of Appeals] must uphold the ALJ's decision where the evidence is susceptible to more than one rational interpretation.

Andrews, 53 F.3d at 1039-40.

## VII.

### DISCUSSION

Plaintiff claims that the Agency's decision should be reversed because the ALJ: (1) improperly rejected the findings of Plaintiff's treating physician, Dr. Ryan; (2) failed to perform a proper step three analysis; (3) improperly assessed Plaintiff's residual functional capacity and the resulting hypothetical questions based thereon were inadequate; (4) improperly discredited Plaintiff's testimony and because (5) the Appeals Council improperly disregarded third-party written

22

statements. (Memorandum in Support of Complaint ("Compl. Mem.") at 1-2). The Court disagrees with each of these contentions. For the reasons discussed below, the Court finds that the ALJ's decision should be AFFIRMED.

**A. The ALJ Properly Considered The Opinions Of Plaintiff's Treating Physician, Dr. Ryan**

Plaintiff claims that the ALJ failed to consider the opinions of her treating physician, Dr. Ryan. (See Compl. Mem. at 2-7). Plaintiff contends that the ALJ's reason for rejecting Dr. Ryan's opinions is "erroneous and does not constitute a specific and legitimate reason to reject them as required by Orn, Murray, and Lester." (Id. at 7). This claim lacks merit as the ALJ considered Dr. Ryan's opinion and provided specific and legitimate reasons for rejecting his opinion.

Contrary to Plaintiff's assertion, the ALJ sufficiently addressed Dr. Ryan's findings. (AR 19-20). The ALJ noted that on May 14, 2008, Dr. Ryan "reported insulin dependent diabetes mellitus, morbid obesity status post bypass, and severe bilateral knee arthritis," in the "Diabetes Mellitus Residual Functional Capacity Questionnaire." (AR 19, See AR 218-221). The ALJ stated:

> Dr. Ryan reported that [Plaintiff] could sit and stand/walk
> for less than [two] hours each, rarely lift [ten] pounds, and
> was precluded from twisting, stooping, crouching, climbing,
> and working in temperature extremes, wetness or humidity.

Furthermore, Dr. Ryan reported that [Plaintiff] suffered symptoms that would constantly interfere with her ability to maintain attention and concentration.

(AR 19).

On March 3, 2009, Dr. Ryan concluded that Plaintiff's bilateral knee arthritis would meet or equal Section 1.02 under the Listing, as Plaintiff's knee impairments qualify as "Major dysfunction of a joint(s)," and so Plaintiff cannot "ambulate effectively." (Compl. Mem. 3-4, AR 300-01). As to this finding, the ALJ noted: "In March 2009, Dr. Ryan reported that the severity of [Plaintiff's] impairments met the requirements of Section 1.02 under the Listing, due to several bilateral knee chondromalacia." (AR 19). Thus, as an initial matter, Plaintiff's assertion that the ALJ failed to consider Dr. Ryan's opinions is incorrect.

**1. Dr. Ryan's Findings Were Not Corroborated By Objective Medical Evidence**

20 C.F.R. § 404.1527(d)(2) explains that an ALJ will generally place more weight on a treating physician's opinions if such opinions are well-supported by objective evidence and are not inconsistent with other substantial evidence in the record.[5] However, in Connett

_____

[5] "Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or

1    v. Barnhart, the Ninth Circuit held:

2

3          [T]he ALJ can reject the opinion of a treating physician in

4          favor of the conflicting opinion of another examining

5          physician if the ALJ makes findings setting forth specific,

6          legitimate reasons for doing so that are based on substantial

7          evidence in the record. . . . Because this evidence

8          contradicts [the other doctors'] conclusions, the ALJ need

9          only have rejected [the treating physician's] conclusions for

10         specific and legitimate reasons supported by substantial

11         evidence in the record.

12

13   Connett v. Barnhart, 340 F.3d 871, 874-75 (9th Cir. 2003) (internal

14   citations and quotations omitted).  In Connett, the treating physician

15   "took [the claimant's] subjective report of symptoms and did a limited

16   physical examination.  When [the claimant] indicated tenderness in her

17   abdomen and pain in her lower back and hip, [the treating physician]

18   wrote her a 'disability certificate' certifying that she was unable to

19   work." (Id. at 875).  Therefore, because the treating physician relied

20   _____

21   from reports of individual examinations, such as consultative
     examinations or brief hospitalizations.  If we find that a treating
22   source's opinion on the issue(s) of the nature and severity of your
     impairment(s) is well-supported by medically acceptable clinical and
23   laboratory diagnostic techniques and is not inconsistent with the other
     substantial evidence in your case record, we will give it controlling
24   weight.  When we do not give the treating source's opinion controlling
     weight, we apply the factors listed in paragraphs (d)(2)(i) and
25   (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3)
26   through (d)(6) of this section in determining the weight to give the
     opinion.  We will always give good reasons in our notice of
27   determination or decision for the weight we give your treating source's
     opinion."  20 C.F.R. § 404.1527(d)(2).
28

on the claimant's "self-reported limitations," which were not supported by his own treatment notes, the Ninth Circuit held that the ALJ properly discredited the treating physician's opinions in favor of the conflicting testimony of other examining physicians. (Id.).

Similarly, in Andrews, the Ninth Circuit held:

> [T]he [S]ecretary was entitled to adopt the opinion of the nonexamining medical advisor, who was present at the hearing and testified, and to discount the opinion of the examining physician, because the ALJ gave specific and legitimate reasons for doing so that were based on substantial evidence in the record in addition to the nonexamining psychologist's opinion. . . . Where the opinion of the claimant's treating physician is contradicted . . . the opinion of the nontreating source may itself be substantial evidence; it is then solely the province of the ALJ to resolve the conflict.

Andrews, 53 F.3d at 1037-1041; see also Johnson, 60 F.3d at 1432 ("The ALJ may reject the opinion [of the treating physician] only if she provides clear and convincing reasons that are supported by the record as a whole.").

Here, after carefully considering the evidence, including the medical opinions of Drs. Tran and Quint, the ALJ concluded: "The medical opinion of Dr. Ryan is given little weight because Dr. Ryan's treatment records do not document signs, symptoms, and/or laboratory findings or

26

objective observations supportive of the limitations he assesses." (AR 19). The ALJ explained:

> The extreme limitations found by the treating physician [Dr. Ryan] are rejected inasmuch as there is a lack of medical pathology of record that would justify such restrictions. In his March 2009 assessment[,] Dr. Ryan indicates that [Plaintiff] has every limitation under the Listing, yet this is contrary to the documentary evidence.

(AR 19).

Indeed, Dr. Ryan's findings were primarily based on the treatment records from May 14, 2008 and March 3, 2009, which do not support Dr. Ryan's ultimate conclusions. (AR 171, 218-21, 331-33). On May 14, 2008, Dr. Ryan reported that Plaintiff suffered from degenerative joint disease in multiple joints, was still obese and had insulin dependent diabetes, despite her weight loss. (AR 218). Dr. Ryan stressed the importance of weight loss and physical activity and suggested to Plaintiff that she consider an insulin pump. (AR 332-33). Dr. Ryan also recommended that Plaintiff follow up with Dr. Gainor, in light of a possible meniscal tear. (AR 333). Dr. Ryan noted that Plaintiff was "alert, well appearing, in no acute distress." (AR 332). Dr. Ryan also stated that Plaintiff had a "[n]ormal mood range and affect." (AR 332). Although in an accompanying May 14, 2008 Form, Dr. Ryan reported that Plaintiff's impairments constantly interfered with her ability to concentrate and maintain attention, no specific

finding was offered to support his conclusion. (AR 218-19). Dr. Ryan's notes, completed on the same day as the May 14, 2008 Form, provide no support for the extreme limitations he ultimately indicated on the May 14, 2008 Form. (See AR 331-33). The ALJ also rejected Dr. Ryan's March 3, 2009 Form, which found that Plaintiff had every limitation of Section 1.02 under the Listing, because Dr. Ryan's assessment was not consistent with documentary evidence.[6]  (AR 19, 300-01).

In rejecting Dr. Ryan's findings, the ALJ noted the findings of Dr. Quint, a State Agency reviewing physician, and the consultative examining physician, Dr. Tran. (AR 18-19). In October 2007, Dr. Quint found that despite diabetes, degenerative joint disease, diabetes and obesity, Plaintiff could perform light work with occasional limitations in postural activities due to her knee problems. (AR 194-98). In December 2007, Dr. Tran found that based on her examination, "[Plaintiff] would be restricted with standing, walking no more than six hours a day or activities involving frequent bending, stooping, kneeling or crouching." (AR 208). Dr. Tran noted: "[Plaintiff] has restriction of knee range of motion. It is unclear whether she has low pain threshold or not. It is unclear if she has maximum effort during the examination." (Id.). Consequently, the ALJ found that the extreme limitations assessed by Dr. Ryan were not supported by the findings of either Dr. Quint or Dr. Tran. (AR 18-19).

---

[6]  As Defendant correctly notes, the ALJ merely explained that Dr. Ryan's report stated that Plaintiff's impairments met the severity of the requirements of Section 1.02 under the Listing, not that Plaintiff actually met the requirements of the , set forth at 20 C.F.R. Part 404, Subpart P, Appendix 1. (Answer at 3 n. 2).

28

Accordingly, because the ALJ provided specific and legitimate reasons to reject Dr. Ryan's findings, no remand is required.

**2.    The ALJ Was Entitled To Reject Dr. Ryan's Findings To The Extent Dr. Ryan Relied Upon Plaintiff's Subjective Complaints Because There Were Clear And Convincing Reasons For Rejecting Plaintiff's Testimony**

To the extent that Dr. Ryan's findings relied upon Plaintiff's subjective complaints, because the ALJ did not find Plaintiff's testimony to be credible, it was also within the ALJ's discretion to reject Dr. Ryan's findings. (See AR 20). The ALJ noted that although Plaintiff testified that she is in constant pain, that her knees give out, and that she uses a cane for balance, due to fluctuating glucose levels, "no end organ damage was indicated in the record." (Id.). The ALJ explained:

New records indicate [Plaintiff] now has a constant glucose monitoring system that warns her when her glucose is not within acceptable levels. When she has low glucose episodes, she will experience extreme fatigue and need to rest for about [two] hours. . . . Although [Plaintiff] alleges extreme limitations in daily activities, and denies riding horses in the past [eighteen] months, the record references horseback riding through at least October 2008, with the claimant noted to be riding horses [three to six] times a week in June 2007. The claimant's allegations are less than fully credible.

29

(Id.).  Indeed, because Plaintiff said that she could not engage in activities like horseback riding, but evidence indicates that she rode horses through at least October 2008, the ALJ did not find Plaintiff's testimony credible.  See Andrews, 53 F.3d at 1043 (finding that "[b]ecause [the treating physician's] diagnoses were based on the self reporting of an unreliable person, the ALJ decided to accord them less weight.  This [the ALJ] could legitimately do; an opinion of disability premised to a large extent upon the claimant's own accounts of his symptoms and limitations may be disregarded, once those complaints have themselves been properly discounted.");  see also Morgan v. Comm'r, of Social Sec. Admin., 169 F.3d 595, 602 (9th Cir. 1999) (internal citations and quotations omitted) (holding that "'[a] physician's opinion of disability premised to a large extent upon the claimant's own accounts of his symptoms and limitations' may be disregarded where those complaints have been 'properly discounted.'").  Accordingly, because the ALJ did not find Plaintiff's subjective complaints to be credible, the ALJ properly rejected Dr. Ryan's findings to the extent that they relied upon such subjective complaints.

    **3.  Conclusion**

    In sum, the ALJ's decision reflects express consideration of Dr. Ryan's opinions.  The ALJ properly rejected Dr. Ryan's opinions because his findings did not corroborate the findings of the objective medical evidence.  To the extent that Dr. Ryan's findings were based on Plaintiff's subjective complaints, the ALJ was entitled to discount them because there were clear and convincing reasons for rejecting

Plaintiff's testimony. Accordingly, the ALJ met her burden of giving specific and legitimate reasons based on substantial evidence for rejecting the Dr. Ryan's opinions in favor of the opinions of Drs. Quint and Tran. No remand is required.

**B.** **The ALJ Properly Found That Plaintiff's Impairments Did Not Meet Or Equal A Listing**

At the third step of the five-step process, the ALJ must determine whether the impairment or combination of impairments meets or equals an impairment under the Listing. See 20 C.F.R. § 416.920. If the impairment or combination of impairments meets or equals an impairment under the Listing, the claimant is presumed disabled and benefits shall be awarded. See Howard v. Barnhart, 341 F.3d 1006, 1011 (9th Cir. 2003) ("To determine whether a claimant is disabled, the ALJ must determine whether a claimant's impairments meet, medically equal or functionally equal a listed impairment in appendix 1 of Subpart P, part 404 of the CFR."); see Bowen v. Yuckert, 482 U.S. 137, 141, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987); see Lester v. Chater, 81 F.3d 821, 828 (9th Cir., as amended April 9, 1996).

A claimant has the burden to show that her condition meets or equals an impairment set forth under the Listing. See Tackett, 180 F.3d at 1098. To meet a listed impairment, a claimant must demonstrate that she meets each characteristic of a listed impairment relevant to her claim and must have every finding specified in the Listing. See id. at 1099; see 20 C.F.R. § 416.925(d). To equal a listed impairment, a

claimant must establish "symptoms, signs and laboratory findings 'at least equal in severity and duration' to the characteristics of a relevant listed impairment." <u>Tackett</u>, 180 F.3d at 1099 (quoting 20 C.F.R. § 404.1526(a)).

"In making a determination of disability, the ALJ must develop the record and interpret the medical evidence." <u>Howard</u>, 341 F.3d at 1012 (internal citations omitted). "In doing so, the ALJ must consider the 'combined effect' of all the claimant's impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity." (<u>Id.</u>; <u>see</u> 20 C.F.R. § 416.923). However, "in interpreting the evidence and developing the record, the ALJ does not need to discuss every piece of evidence." <u>Howard</u>, 341 F.3d at 1011 (citing <u>Black v. Apfel</u>, 143 F.3d 383, 386 (8th Cir. 1998)); <u>see also</u>, <u>Vincent v. Heckler</u>, 739 F.2d 1393, 1394-95 (9th Cir. 1984).

Here, the ALJ determined that Plaintiff's alleged impairments did not meet or medically equal any impairment under the Listing. (AR 17). As discussed above, the ALJ afforded Dr. Ryan's findings little weight because his "treatment records do not document signs, symptoms and/or laboratory findings or objective observations supportive of the limitations he assesses." (AR 19). Instead, the ALJ relied on the opinions from State agency physicians who took into account all of Plaintiff's alleged impairments. (AR 17-20). The reviewing physicians considered Plaintiff's obesity and claims of pain and the examining physician considered Plaintiff's diabetes, hypertension, and degenerative joint disease, as well as her mild to moderate obesity.

(AR 194-98, 205-08).   These physicians reported that Plaintiff was capable of performing at a sedentary exertional level.  (AR 18-19, 194-98, 205-08, 210).

The ALJ observed that although "Dr. Ryan indicates that [Plaintiff] has every limitation under the Listing . . . this is contrary to the documentary evidence."  (AR 19).  For these reasons, the ALJ rejected Dr. Ryan's findings that Plaintiff met the criteria of Section 1.02 under the Listing.  (Id.).

Moreover, the ALJ also concluded that Plaintiff did not present sufficient evidence that her diabetes met Section 9.08 under the Listing.  (AR 17).  In particular, Plaintiff had no neuropathy, produced no appropriate lab results and had no visual impairment.[7]  (AR 19-20, 171-73, 175, 177, 179, 182, 227, 229-40, 258-59, 288, 302-03, 305, 312, 314-16, 320, 324, 327-29, 335-39).  Indeed, even though Plaintiff was obese, she failed to provide evidence indicating that the extra weight affected her cardiovascular, pulmonary or musculoskeletal systems.  (See AR 175-76, 205-08, 223-25, 241, 332-33, 359; see Celaya v. Halter, 332 F.3d 1177 n. 1 (9th Cir. 2003) (finding that "[o]besity may still enter into a multiple impairment analysis, but only by dint of its impact upon the claimant's musculoskeletal, respiratory, or cardiovascular system.").  Thus, Plaintiff failed to establish that her impairments met or equaled any of the Sections under the Listing.

---

[7]  Plaintiff contends that her impairments meet or equal Section 1.02 under the Listing, pursuant to Dr. Ryan's findings, but for the reasons stated above, the Court rejects Dr. Ryan's findings.  (See Compl. Mem. 7-8).

The ALJ also found that "[Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (AR 19). Specifically, as mentioned above, the ALJ concluded that "the record references horseback riding through at least October 2008, with [Plaintiff] noted to be riding horses 3-6 times a week in June 2007," such that Plaintiff's allegations of disabling pain "are less than fully credible, and her alleged limitations are not corroborated by the objective medical evidence." (AR 20).

As the Ninth Circuit explained in <u>Lewis v. Apfel</u>, an ALJ is "simply require[d] . . . to discuss and evaluate the evidence that supports his or her conclusion; [controlling caselaw] does not specify that the ALJ must do so under the heading 'Finding.'" 236 F.3d 503, 513 (9th Cir. 2001). Here, the ALJ stated that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526)." (AR 17). The ALJ considered Plaintiff's degenerative joint disease of the knees, history of moderate and morbid obesity, and insulin-dependent diabetes mellitus. (AR 17-19). The ALJ explained that because Plaintiff's alleged conditions were contrary to the documentary evidence and less than fully credible, Plaintiff's alleged conditions failed to meet or equal each element of any Section under the Listing. See <u>Lester</u>, 81 F.3d at 829 (internal citations omitted) (holding that "[i]n determining whether the claimant's combination of impairments equals a particular Listing, the Commissioner must consider whether his 'symptoms, signs, and laboratory

34

findings are at least equal in severity to the listed criteria.'"). Therefore, even though the ALJ did not do so under the heading "Findings," she nonetheless found that Plaintiff's alleged impairments did not meet or equal any Section under the Listing. (Id.).

The ALJ performed a proper step three analysis when she rejected the findings of Dr. Ryan because they were not supported by the record, and instead, relied upon the opinions of the State agency physicians to determine that Plaintiff's impairments did not meet or equal any of the Sections under the Listing. Further, to the extent that the burden rested with Plaintiff to show a disability, Plaintiff failed to present sufficient evidence that her diabetes met all the criteria for Section 9.08 under the Listing. See Sullivan, 491 U.S. at 530-31. Accordingly, the ALJ properly discussed and evaluated evidence to support the conclusion that Plaintiff's impairments singularly or in combination, did not meet or equal any of the Sections under the Listing. (AR 17-19).

**C.** **The ALJ Properly Assessed Plaintiff's RFC And The Resulting Hypothetical Question Was Adequate**

**1.** **Proper Assessment of Plaintiff's Residual Functional Capacity**

Although the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," the ALJ concluded that "[Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual

functional capacity assessment." (AR 19).  The ALJ stated:

> The medical opinions of consultant examiner Dr. Tran, and
> State agency medical consultant Dr. Quint indicating a
> residual functional capacity for less than light work are
> fully credible based upon supportability with medical signs
> and laboratory findings, and consistency with the evidence.

(Id.).

The ALJ properly found that Plaintiff has the residual functional capacity to do other work.  Social Security Ruling 96-8p defines a claimant's residual functional capacity as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular basis" and is defined as meaning "[eight] hours a day, for [five] days a week, or an equivalent work schedule."  Social Security Ruling 96-8p; see Smolen, 80 F.3d at 1291 (holding that "[a] claimant's 'residual functional capacity' is what a claimant can still do despite her limitations.").  Further, "[i]n determining residual functional capacity, the ALJ must consider subjective symptoms such as fatigue and pain."  (Id. (citing Social Security Ruling 88-13 and 20 C.F.R. § 404.1529(d))).

The ALJ found that the medical opinions of Drs. Tran and Quint were supported by the record and consistent with the evidence.  (AR 19).  Indeed, based on a "comprehensive orthopedic evaluation," Dr. Tran concluded that Plaintiff would be "restricted with standing, walking no more than six hours a days or with activities involving frequent

36

bending, stooping, kneeling or crouching." (AR 205-06, 208). Dr. Tran therefore restricted Plaintiff from performing frequent bending, stooping, kneeling or crouching, but concluded that occasional performance of these activities would not have a significant effect on the occupational base for light or sedentary work. (AR 208). By contrast, as mentioned above, Dr. Ryan's treatment records did not "document signs, symptoms and/or laboratory findings or objective observations supportive of the limitations he assessed." (AR 19). Accordingly, the ALJ properly relied on the medical opinions of Drs. Tran and Quint to assess Plaintiff's residual functional capacity.

## 2. Proper Hypothetical Question

"If a claimant shows that he or she cannot return to his or her previous job, the burden of proof shifts to the Secretary to show that the claimant can do other kinds of work." Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988). Specifically, the Secretary must show that the claimant can perform other types of work that exist in the national economy. (Id.). "Without other reliable evidence of a claimant's ability to perform specific jobs, the Secretary must use a vocational expert to meet that burden." (Id.).

"The testimony of a vocational expert is valuable only to the extent that it is supported by medical evidence." Magallanes v. Bowen, 881 F.2d 747, 757 (9th Cir. 1989). "The vocational expert's opinion about a claimant's residual functional capacity has no evidentiary value if the assumptions in the hypothetical are not supported by the record." (Id.); see Osenbrock v. Apfel, 240 F.3d 1157, 1163 (9th Cir. 2001)

37

(holding that "[a]n ALJ must propose a hypothetical that is based on medical assumptions supported by substantial evidence in the record that reflects each of the claimant's limitations.").

Therefore, "[i]n order for the testimony of a [vocational expert] to be considered reliable, the hypothetical posed must include all of the claimant's functional limitations, both physical and mental supported by the record." Flores v. Shalala, 49 F.3d 562, 570-71 (9th Cir. 1995). "An ALJ is free to accept or reject restrictions in a hypothetical question that are not supported by substantial evidence." Osenbrock, 240 F.3d at 1163.

In Thomas v. Barnhart, the Ninth Circuit held:

> Without objective medical evidence that [the claimant]
> [required medical assistance], and in light of the ALJ's
> findings with respect to [the claimant's] lack of
> credibility, there [is] no reason to include [the claimant's]
> subjective use of [the medical assistance] in the
> hypothetical to the VE.

Thomas v. Barnhart, 278 F.3d 947, 959 (9th Cir. 2002); see Greger v. Barnhart, 464 F.3d 968, 973 (9th Cir. 2006) (internal citations omitted) ("The ALJ . . . is free to accept or reject restrictions in a hypothetical question that are not supported by substantial evidence."); see Copeland v. Bowen, 861 F.2d 536, 540 (9th Cir. 1988) (holding that "exclusion of some of a claimant's subjective complaints in questions to a vocational expert is not improper if the ALJ makes specific

38

findings justifying his decision not to believe the claimant's testimony about claimed impairments such as pain.").

Here, because the ALJ found that Plaintiff's testimony was not credible, and that determination is supported by substantial evidence, as discussed above, the hypothetical questions posed to the VE did not have to include Dr. Ryan's findings or Plaintiff's testimony. For example, Plaintiff failed to show that the pain she allegedly suffered interfered with her mental functioning or rose to the level she alleged. (See AR 31, 36). Indeed, Plaintiff testified that she used mild over-the-counter pain relievers, like Tylenol and Advil, which would have likely not been sufficient, had the pain been as severe as Plaintiff alleged.[8] (AR 20, 31, 36; see Johnson, 60 F.3d at 1434 ("In addition to the inconsistencies within claimant's testimony, the ALJ noted the absence of medical treatment for claimant's back problem between 1983 and October 23, 1986, suggesting that if the claimant had actually been suffering from the debilitating pain she claimed she had, she would have sought medical treatment during that time.").

Further, as discussed above, the ALJ found the findings of Drs. Tran and Quint, who reported that Plaintiff could perform sedentary work, to be more reliable than Dr. Ryan's findings. (AR 18-19, See also AR 208). Thus, as Defendant contends, "the occasional performance of

_____

[8]    The Court notes that "although a conservative course of treatment can undermine allegations of debilitating pain, such fact is not a proper basis for rejecting the claimant's credibility where the claimant has a good reason for not seeking more aggressive treatment." Carmickle, 533 F.3d at 1162. Here, Plaintiff only asserted that she could not take stronger pain medication on account of the gastric bypass surgery in her testimony. (AR 31).

39

these activities would not have a significant effect on the occupational base for light or sedentary work." (Answer at 6; see SSR 85-15 (occasional postural activities have no effect on sedentary and light occupational base)). Because it is reasonable to presume that the VE was familiar with the definition for sedentary work, the hypothetical question was reasonable. See Magallanes, 881 F.2d at 755.

The hypothetical posed to the VE reflected all the limits supported by the record because it was based on the reports of Drs. Tran and Quint. The ALJ properly told the VE that Plaintiff could perform only sedentary work, as defined by 20 C.F.R. § 404.1567(a); should use a cane when walking or standing; should not work around unprotected heights or dangerous machinery; and could occasionally walk on uneven terrain. (AR 17, 41-42). Accordingly, because the ALJ relied on substantial medical evidence in the record, the ALJ's residual functional capacity finding was reasonable and the ALJ's reliance on the VE's testimony was proper.

**D.    The ALJ Properly Rejected Plaintiff's Testimony And The Appeals Council Properly Weighed The Third-Party Statements**

Plaintiff's fourth claim is that the ALJ improperly rejected Plaintiff's testimony and the Appeals Council ruled to properly weigh the third-party written statements of Hansen and Redd. (Compl. Mem. at 15). Plaintiff contends that the ALJ's proffered reasons for rejecting her testimony were not specific, clear, or convincing, as required by Smolen. (Id. at 17). Plaintiff also claims that her husband, Hansen, and close friend, Redd, "submitted statement[s] to the Appeals Council verifying that [P]laintiff has not ridden her horses since early 2007

40

and that her activities with the care of her horses are severely limited." (Id. at 19). The Court disagrees.

## 1. Plaintiff's Testimony

Whenever an ALJ's disbelief of a claimant's testimony is a critical factor in a decision to deny benefits, as is the case here, the ALJ must make explicit credibility findings. Rashad v. Sullivan, 903 F.2d 1229, 1231 (9th Cir. 1990). "To determine whether a claimant's testimony regarding subjective pain or symptoms is credible, an ALJ must engage in a two-step analysis." See Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007). First, the ALJ must determine whether the claimant "has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." (Id. (internal quotation marks omitted)). The claimant, however, "need not show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom." (Id. (internal quotation marks omitted)).

If the claimant meets this first test, and there is no evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." Smolen, 80 F.3d at 1281 (internal citations omitted). The ALJ may not discredit a claimant's testimony of pain and deny disability benefits solely because the degree of pain alleged is not supported by objective medical evidence. See Bunnell v. Sullivan, 947 F.2d 341, 346-47 (9th Cir. 1991).

41

However, an ALJ may reject testimony if the claimant's credibility is questionable:

>In weighing a claimant's credibility, the ALJ may consider
>his reputation for truthfulness, inconsistencies either in
>his testimony or between his testimony and conduct, his daily
>activities, his work record, and testimony from physicians
>and third parties concerning the nature, severity, and effect
>of the symptoms of which he complains.

Light v. Social Sec. Admin., 119 F.3d 789, 792 (9th Cir. 1997); see Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001) (finding that objective medical evidence supporting the severity of the claimant's claimed limitations was inconsistent with the claimant's testimony). As the Ninth Circuit explained in Light, "[a]n ALJ's finding that a claimant generally lacked credibility is a permissible basis to reject pain testimony." Light, 119 F.3d at 792. However, "[t]o find the claimant not credible, the ALJ must rely either on reasons unrelated to the subjective testimony (e.g., reputation for dishonesty), or conflicts between his testimony and his own conduct, or on internal contradictions in that testimony." (Id.). If the ALJ's credibility finding is supported by substantial evidence in the record, the Court may not engage in second-guessing.

Here, the ALJ applied the two-step analysis to Plaintiff's subjective symptom testimony and found clear and convincing evidence for rejecting Plaintiff's testimony. The ALJ explained:

42

> [Plaintiff's] medically determinable impairments could
> reasonably be expected to cause the alleged symptoms;
> however, [Plaintiff's] statements concerning the intensity,
> persistence and limiting effects of these symptoms are not
> credible to the extent they are inconsistent with the above
> residual functional capacity assessment.

(AR 19).

The ALJ noted that "the primary basis on which disability is alleged is disabling pain," but a lack of objective evidence supported Plaintiff's claimed limitations. (AR 19). As mentioned above, the ALJ stated that Plaintiff takes only "Tylenol for her pain." (AR 20, 30-31). Similarly, although Plaintiff claimed that she is in constant pain and that her knees give out due to fluctuating glucose levels, "no end organ damage was indicated in the record." (AR 20). The ALJ explained that "[n]ew records indicate that [Plaintiff] now has a constant glucose monitoring system that warns her when her glucose is not within acceptable levels." (AR 20).

Plaintiff's physical therapy notes showed an increased ability to walk, reduced pain and 80-85% improvement. (AR 252, 260, 282). The notes of Rene Orquiza, M.D., dated December 12, 2007, also indicate that Plaintiff suffered from only mild osteoarthritic and osteopenic changes in her knees:

> There is no evidence of fractures, dislocations, or bone
> destruction. Mild osteoarthritic and osteopenic changes on

both knees in the forms of marginal sclerosis, hypertrophic
lipping, with moderate joint spaces narrowing. The soft
tissues and suprapatellar bursa are unremarkable.
IMPRESSION: Bilateral mild osteoarthritic and osteopenic
changes with moderate joint spaces narrowing. No acute
osseous injury changes. Otherwise unremarkable exam.

(AR 210). Dr. Ryan's Progress Note from May 14, 2008 further indicates
that Plaintiff was "in no acute distress." (AR 332). Although
Plaintiff also alleged that she did not respond well, but the ALJ noted
that the record indicates that "[Plaintiff] has good response to Hyalgan
injections." (AR 20, 30-31; see also AR 184-86). Plaintiff testified
in July 2009 that she had not ridden horses for at least 18 months:

I haven't . . . ridden horses in, well, a good, year-and-a-
half or so. I still own them. I'm hoping some day to be
able to get back on them, but . . . I have a friend that
rides them right now for me, but . . . I'm not sure if I'll
be able to . . . keep them.

(AR 20, 34). However, other evidence indicated that Plaintiff had
ridden horses in 2007 and continued to ride in 2008. (AR 258 ("The
patient rides her horse [three to six] times per week"), 264, 266, 278
("She does ride horses a bit and tries to do the best she can, but she
does have some limitations.")). Additional evidence suggested that
Plaintiff was involved in the care and feeding of her horses. (AR 140).
Based on this evidence, it was reasonable for the ALJ to reject
Plaintiff's pain testimony.

44

Thus, the ALJ provided clear and convincing reasons for rejecting Plaintiff's credibility. See Johnson, 60 F.3d at 1434 ("The ALJ also identified several contradictions between claimant's own testimony and the relevant medical evidence and cited several instances of contradictions within the claimant's own testimony. We will not reverse credibility determinations of an ALJ based on contradictory or ambiguous evidence.").

### 2.    Third-Party Statements

Plaintiff alleges that the Appeals Council erred when it rejected the third-party written statements provided by her husband, Hansen, and her close friend, Redd.    (Compl. Mem. at 19-20).    Specifically, Plaintiff argues that it was improper for the Appeals Council to summarily discount these third-party statements by stating that: "this information does not provide a basis for changing the Administrative Law Judge's decision."    (Id. at 19; AR 5).

In Carmickle, the Ninth Circuit explained that "[t]he ALJ must consider competent lay testimony but in rejecting such evidence, [the ALJ] need only provide reasons for doing so that are germane to the witness."    533 F.3d at 1164; Smolen, 80 F.3d at 1289 (holding that "the ALJ can reject the testimony of lay witnesses only if he gives reasons germane to each witness whose testimony he rejects.").

The Appeals Council received the third-party statements but found that they did not provide grounds for reversing the ALJ's decision. (See AR 5, 7).    Although these statements suggest that Plaintiff's

45

riding ceased in either 2006 or 2007, there is record evidence to contradict these statements, suggesting that Plaintiff's riding continued through 2007 and 2008. Therefore, because the ALJ's credibility determination and reasoning were adequately supported by substantial evidence in the record, the Appeals Council made a proper determination regarding the materiality of the third-party statements.

Even if this Court were to remand this action, in order to consider this conflicting evidence, the result would remain the same for several reasons. First, there remains compelling evidence in the record that Plaintiff engaged in physical activity inconsistent with her claims of disability. Second, the medical evidence, other than the findings of Dr. Ryan, is consistent with a finding that Plaintiff is not disabled. As such, because the ALJ's determination is reasonable, it will not be second-guessed by this Court. See Carmickle, 533 F.3d at 1161-62 (holding that "as long as there remains substantial evidence supporting the ALJ's conclusions on . . . credibility and the error does not negate the validity of the ALJ's ultimate credibility conclusion, such is deemed harmless and does not warrant reversal."). Thus, the ALJ's decision remains legally valid despite these third-party statements and no remand is required.

\\
\\
\\
\\
\\
\\
\\

46

**VIII.**

**CONCLUSION**

Consistent with the foregoing, and pursuant to sentence four of 42 U.S.C. § 405(g),[9] IT IS ORDERED that judgment be entered AFFIRMING the decision of the Commissioner.  IT IS FURTHER ORDERED that the Clerk of the Court serve copies of this Order and the Judgment on counsel for both parties.

DATED: June 8, 2011

```
_____/S/_____
SUZANNE H. SEGAL
UNITED STATES MAGISTRATE JUDGE
```

---

[9]  This sentence provides: "The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."

47